SAMANTHA M. WILLIAMS
(admitted pro hac vice)
Email: williamssam@sec.gov
Telephone: (202) 551-4061

Attorneys for Plaintiff
Securities and Exchange Commission
100 F Street N.E.
Washington, D.C. 20549-5949

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>JONATHAN MIMUN (A/K/A JONATHAN MAYMON) and RONN BENHARAV,<br><br>Defendants. | Case No. 2:21-cv-1314<br><br>**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR ENTRY OF JUDGMENT AGAINST JONATHAN MIMUN and RONN BENHARAV** |

Pursuant to Fed. R. Civ. P. 55(b), the Securities and Exchange Commission ("SEC") seeks the entry of default judgment against defendants Jonathan Mimun ("Mimun") and Ronn BenHarav ("BenHarav") to include injunctive relief, disgorgement, and civil penalties in the amounts set forth herein.

## I.  PROCEDURAL HISTORY

The SEC filed this action on July 12, 2021 alleging that Mimun and his co-defendant BenHarav (collectively "Defendants") orchestrated a multi-million dollar scheme to defraud retail investors in the United States through high-pressure "boiler room" tactics in the offer and sale of unregistered security-based "binary options" from

at least December 2014 to June 2017 (the "Relevant Period").  *See* ECF No. 1 at ¶¶1-2.

After being properly served, Defendants failed to appear or otherwise respond to the Complaint, and the Clerk entered an order of default against them.  *See* ECF No. 17.  The SEC now seeks entry of a default judgment against both Defendants.

The SEC asks the Court to enter final judgments against BenHarav and Mimun permanently enjoining them from future violations of Sections 5 and 17(a) and of the Securities Act of 1933, Section l0(b) of the Securities Exchange Act of 1934 and Rule l0b-5 thereunder, controlling any broker or dealer who violates Section 15(a)(1) of the Securities Exchange Act of 1934, aiding and abetting any broker or dealer who violates Section 15(a)(1) of the Securities Exchange Act of 1934, and ordering them to pay disgorgement with prejudgment interest and civil penalties.

## II. FACTUAL BACKGROUND

### A. The Offer and Sale of Unregistered Securities

Defendants perpetrated their binary options scheme using a boiler-room like telephone call center (the "Call Center") through a company called JMRB Media, Ltd. ("JRMB").  Defendants also used a complex web of straw companies they owned and controlled, including Oracle Stone, Ltd.; Sky Runway, Ltd.; Sky Runway Investments, Ltd.; and Riverrun Partners, Ltd. (the "Straw Companies").  The Straw Companies, in turn, used the Call Center, websites, and email advertising to promote themselves as brokers under the trade names Porter Finance and Dalton Finance (collectively the "Brokers") *See Id.* at ¶¶2-3.

Through the Call Center and the Brokers' websites, the Defendants and the entities under their control offered and sold security-based binary options via telephone and the internet.  *Id*. at ¶¶12, 30, 34, 41-52.  A binary option is a financial instrument that expires at a predetermined time where the payout is contingent on a prediction about an underlying asset, such as security or securities index in a yes/no or "binary" proposition.  In a binary option, if the investor's prediction is correct, they will receive

a predetermined amount of money.  If his prediction is incorrect, they will forfeit all or nearly all of his investment.  In one common form, the investor predicts whether a publicly traded asset will be above or below a specific price at a specific time.  *Id*. at ¶11.  Defendants offered binary options where the referenced assets were securities or securities indices, including the common stock of companies traded on exchanges in the United States.  *Id.* at ¶12.

Where the reference asset for a binary option is a security, the binary option is itself a security.  *See SEC v. Banc de Binary LTD.,* 964 F. Supp. 2d 1229, 1231 (D. Nev. 2013) (binary option based on a security is a "privilege" under the Securities Act and the Exchange Act).  *See also* Release No. 34-55871, 2007 WL 2031576 *6-8 (June 6, 2007) (binary option based on a security is an "option" under the Exchange Act of 1934).  None of the security-based binary options Defendants offered were registered with the SEC.

## B. The Defendants Engaged in a Scheme to Defraud

At the Defendants' direction and control, the Brokers pitched themselves to prospective investors as traditional brokers recommending and facilitating trades for the benefit of investors. Unbeknownst to the investors however, and unlike a traditional broker, the Brokers were actually the counterparty to the investors' trades.  *Id*. at ¶4. As a result, the Brokers made money from investors' losses and their interests were directly adverse to the interests of their investors.  *Id.* at ¶20. This material fact was never disclosed to investors.  The viability of this model required two things: (a) that investors deposit and then lose enough money to cover the enterprise's expenses and generate a profit and (b) a constant infusion of new money to replace the money that investors lost.  *Id.* at ¶20.  To ensure this outcome, Defendants structured the binary option profit/loss ratio so that investors trading over a sufficient period of time would tend to lose all of their investment.  *Id*. at ¶13.  Again, none of this information concerning the scheme was disclosed to investors.

Because investors were unlikely to participate in an investment designed to lose money, the Call Center and the Brokers engaged in deceptive practices that created the false appearance that the Brokers were a traditional brokerage firm offering investments that had the potential to make money for investors. In addition, the Call Center and Brokers made misrepresentations and engaged in other deceptive practices that induced investors to deposit funds and continue trading, thereby maximizing investor losses. The fraud worked – the majority of investors lost most or all of the money they deposited with the Brokers.

### i. The Brokers Attracted Investors with Fraudulent Marketing Campaigns

The Brokers, at the direction of the Defendants, found many investors through internet advertisers called "affiliate marketers" that targeted U.S. investors with fraudulent advertising. *Id*. at ¶29.  Call Center employees referred to the advertising campaigns as "make-money funnels" because the advertisements typically told the viewers that they would receive access to "an algorithm that will tell them how to make money" trading binary options. *Id*.  The make-money funnels Defendants used typically advertised "get rich quick schemes" promising investors access to secret or proprietary systems for trading binary options that had supposedly generated huge returns for other investors. *Id*. at ¶30.  These statements were false.  The systems advertised did not exist and, contrary to the promised results, most investors lost money. *Id*. at ¶¶57-58, and 74.  The affiliate marketers sent these false advertisements through emails that lead investors to websites including additional fraudulent statements. *Id*. at ¶30.

### ii. The Brokers Used Deceptive Websites to Attract Investors

Opening and trading in an account at the Brokers ultimately occurred through websites. *Id*. at ¶33.  The design of the website was a deceptive practice because it created the false appearance of actual market-oriented trading that looked similar to what an investor would see on a legitimate broker's website. *Id*. at ¶34.  The trading

engine referred to binary options positions as "assets" or "investments" and, in the case of security-based options, sometimes displayed the logos of the referenced companies. *Id.* Despite appearances, investors were not purchasing real financial assets from any real market and were not trading in any market with other investors. The so-called trades and investments reflected on an investor's on-line account statements were simply book entries reflecting how much money the investors would win if their predictions were correct or lose to the Brokers if their prediction about securities proved incorrect. The account balances investors saw when viewing the trading platform did not reflect money in any segregated account but instead were, as one former employee put it, "just numbers on a screen." *Id.* at ¶¶35-36. Indeed, the Brokers did not have sufficient money in their bank accounts to pay the obligations owed to their investors. *Id.* at ¶36.

To induce investors who had deposited money to deposit even more, Mimun and BenHarav devised the deceptive device of a "win button" that manipulated the trading engine. The win button was available to the Brokers to allow them temporarily skew the trading engine to place investors on the winning side of trades. When activated, the win button allowed investors to achieve winning trades inducing them into depositing more money on the mistaken belief that trading on the platform was profitable. *Id.* at ¶¶52-54.

### iii. The Call Center Used Fraudulent Tactics to Solicit Investors and Entice them to Trade.

At its height, the Call Center employed as many as 160 sales agents tasked with getting investors to make deposits and to use that money to trade binary options with the eventual aim of seeing investors lose their funds. *Id.* at ¶ 39. The Call Center employees were incentivized to use false and misleading tactics to induce investors to deposit funds and to discourage withdrawals because they were compensated based on the net deposits (*i.e.* deposits minus withdrawals) they obtained from investors. *Id.* at ¶40.

The Call Center employees' contacts with investors were fraudulent from the outset.  Call Center agents falsely portrayed themselves as experts that were there to help investors make money. *Id*. at ¶41.  For example, the sales agents used aliases instead of real names.  *Id*. at ¶42.  And sales agents were permitted to fabricate their titles, choosing ones normally associated with legitimate trading and the provision of financial advice.  Even though they typically had little or no relevant experience, they called themselves "brokers," "analysts," "Head of Trading," "Senior Financial Advisors," and the like.  Some also claimed to have MBAs or membership in the Chartered Financial Analyst Institute.  Call Center sales agents also often falsely claimed to have formerly worked at major financial institutions like Bank of America or JPMorgan Chase. *Id*.  The sales force also lied about their locations, claiming, for example, they were based in London, instead of their actual location in Israel.  *Id*. at ¶42.

Once they had established their "credentials," the salespersons lied and used manipulative devices to persuade investors to make and increase deposits with the Brokers.  *Id*. at ¶43.  As former JMRB employees put it, they could tell investors whatever they wanted as long as it resulted in a deposit. *Id*.  The fraudulent tactics include:

- ***Alignment of Interest***. Call Center salespersons told investors making deposits with the Brokers, in substance, "We only make money when you make money" and "I'm here to help you make a profit."  Yet the Brokers profited only from investor losses, not investor profits.  *Id*. at ¶¶44-51.

- ***The Bait-and-Switch Win button***. Call Center employees activated the "win button" for specific investors to prove to them that trading with the Brokers was profitable.  Following those trades, sales agents solicited additional deposits (and prevented investors from withdrawing those deposits by applying bonus funds) with pitches like "just think how much we could be making if we were working with more capital and placing larger trades." *Id*. at ¶¶52-54.  Once the "win button" was deactivated, investors were at the mercy of the Porter Broker's standard profit/loss ratio, which, over time, was designed to cause investors to lose money.

- ***False Claims of Past Success and Future Profits***.  The salesforce routinely lied to clients about their supposed past successes in making money by trading binary options, in some cases boasting that they generated 70-85 percent monthly return for investors.  Similarly, salespersons also told investors if they made a deposit they could expect to make significant returns on their investments.  Tragically, some even convinced investors to liquidate their other investments—including their retirement funds—based on the false claim that binary options trading could generate far greater returns.  *Id*. at ¶¶67-69.  In reality, most investors making deposits with the Brokers lost money and the Brokers relied on these losses to operate.  *Id*. at ¶¶57-58.

- ***VIP Tiers***:  The Brokers' website and Call Center salespersons held out illusory "perks" supposedly available to investors if they deposited enough money to reach certain VIP "tiers."  The tiers included false and misleading "benefits" including "bonuses" and "risk-free-trades," trading signals, a dedicated broker, and managed accounts.  But in reality, the perks were fraudulent devices designed to induce large deposits and prevent withdrawals by using bonus funds.  *Id.* at ¶¶63-66.

- ***Withdrawals***: The Brokers' websites touted the ease of making withdrawals.  To reinforce this false statement, Call Center salespersons encouraged investors to withdraw small amounts after early profitable trading, often through the use of the "Win Button."  This was a ruse designed to give investors the false impression that withdrawals were easy (*Id*. at ¶70).  But, because employees were compensated based on deposits and penalized for withdrawals, once the investor had no further funds to deposit, the salespersons then refused to honor the withdrawal requests.  *Id*. at ¶¶55-56; ¶¶59-60; ¶71.

**C. Defendants are in Default**

The SEC caused Defendants, both residents of Israel, to be served with the Summons and Complaint pursuant to Fed. R. Civ. P. 4(f)(1) and the Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (the "Hague Convention").  Representatives of the Israeli Administration of Courts have certified that BenHarav and Mimun were served on August 3, 2021 and January 6, 2022, respectively.  They have further certified that service was made pursuant to Israeli law for the service of documents in an action pending in Israel as permitted by Article 5(a) of the Hague Convention.  ECF Nos. 6-

1 and 14-2.  On November 2, 2021 and August 18, 2022, the SEC filed proof of service with the Court.  ECF Nos. 6 and 14.

Defendants had 21 days from service to file a response to the Complaint – until September 13, 2021 for BenHarav and June 22, 2022 for Mimun.  Fed. R. Civ. Proc. 12(a)(1)(A)(i).   Neither Defendant has filed a responsive pleading.  ECF No. 16.  On August 25, 2022, the SEC requested that the Clerk enter both Defendants' defaults.  *Id.*  The Clerk entered a default against both Defendants on September 9, 2022.  Dkt. No. 17.

## III.   ARGUMENT

Pursuant to Fed. R. Civ. P. 55, the Court may grand a default judgment where the party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend.  Whether to enter a default judgment after the clerk's entry of default lies within the discretion of the trial court.  *Hand & Nail Harmony, Inc. v. Guangzhou Shun Yan Cosms. Co.*, No. 2:12-cv-01212-JCM, 2015 WL 4378197, at *2 (D. Nev. July 15, 2015) (J. Mahan).  *See also Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).

In exercising its discretion, the trial court should consider seven factors: (1) the possibility of prejudice to plaintiff, (2) the merits of the claims, (3) the sufficiency of the complaint, (4) the amount of money at stake, (5) the possibility of a dispute concerning material facts, (6) whether default was due to excusable neglect, and (7) the policy favoring a decision on the merits.  *Id.* (citing factors articulated in *Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986)).  For the reasons discussed below, the SEC respectfully submits that the *Eitel* factors favor imposing a default judgment against the Defendants.

### A. The SEC Will Suffer Prejudice without the Entry of a Default Judgment.

The first *Eitel* factor considers the possibility of prejudice to the plaintiff if the judgment is not entered.  Where a party fails to appear or otherwise defend itself against

the moving party's claims, "[w]ithout default judgment, [the moving party] would consequently suffer prejudice by expending additional resources to litigate the unopposed [c]laims." *Bank of New York Mellon v. Meister Park Homeowners Ass'n*, No. 216-cv-01969 GMN-EJY, 2020 WL 10147130, at *2 (D. Nev. Nov. 25, 2020). *See also Ocwen Loan Servicing, LLC v. Operture Inc.*, No. 217CV01026GMNCWH, 2018 WL 1100904, at *2 (D. Nev. Feb. 12, 2018) ("Given Defendant's failure to participate in this case, Plaintiff would be prejudiced by having to expend additional resources litigating an action that appears to be uncontested."), *report and recommendation adopted*, No. 217-cv-01026-GMN-CWH, 2018 WL 1092337 (D. Nev. Feb. 28, 2018). Here, the Defendants have failed to appear or defend themselves, and the SEC would be prejudiced by having to expend resources to litigate the uncontested claims.

**B. The Complaint Contains Seven Well-Pled Claims against Defendants**

The second and third *Eitel* factors favor default judgment where the complaint states a plausible claim for relief. *Hand & Nail Harmony, Inc.* 2015 WL 4378197, at *3. In assessing whether the Complaint states a plausible claim, "the well-pleaded factual allegations of the complaint are taken as true, except for those allegations relating to damages." *Id.* at *4. As discussed below, the SEC's Complaint easily meets that standard for each of the seven causes of action alleged.

**i. The SEC has Stated a Claim that Defendants Offered and Sold Unregistered Securities – Count Three**

Count Three of the Complaint alleges that Defendants violated Section 5 of the Securities Act, which prohibits the offer or sale of unregistered securities through interstate commerce. ECF No. 1 at ¶¶86-89. To state a claim for violation of Section 5, the Complaint must allege that (1) no registration statement was filed with the SEC and in effect; (2) the defendant directly or indirectly sold or offered to sell securities; and (3) the sale or offer was made through interstate commerce. *SEC v. CMKM Diamonds, Inc.*, 729 F.3d 1248, 1255 (9th Cir. 2013). Section 5 violations are strict

liability offenses and do not require proof of scienter.  *Id.* at 1256.

Here, the Complaint alleges that no registration statement was filed or in effect for any of the security-based binary options offered and sold by the Call Center and the Brokers (ECF No. 1 at ¶2, ¶5, ¶87) and that these securities were offered and sold through the telephone, email, and internet, which are all means of interstate commerce. *Id.* at ¶16.  *SEC v. v. Inteligentry, Ltd.*, No. 2:13-CV-00344-RFB, 2015 WL 1470498, at \*13 (D. Nev. Mar. 31, 2015), *aff'd* 749 F. App'x 661 (9th Cir. 2019) (internet); *Spilker v. Shayne Lab'ys, Inc.,* 520 F.2d 523, 526 (9th Cir. 1975) (telephone)

Liability under Section 5 is not limited to the issuer of the securities.  Those who are "both a necessary participant and substantial factor in the sales transaction" are also primarily liable.  *Id.* (citation and internal punctuation omitted).  *CMKM Diamonds, Inc.*, 729 F.3d 1255.  An individual who devises the scheme by which the securities will be sold and meets personally with those directly offering and selling securities is liable for Section 5 violations.  *SEC v. Murphy,* 626 F.2d 638, 652 (9th Cir. 1980). (corporate officer was liable under Section 5 where corporation sold unregistered securities through broker dealers by way of a plan formulated by officer, who met frequently with broker dealers regarding the plan).  *See also SEC v. Levine*, No. 207CV00506LDGRJJ, 2010 WL 11578883, at \*1 (D. Nev. July 28, 2010) (officer of issuer who approved the sale of stock and signed the paperwork authorizing the sale was liable under Section 5).

As described by a former employee, BenHarav was the "number one" who "bullied" everyone in the office and had almost all the say in how the operation was going to run, especially financially, and where the direction of the companies was going to go.  *Id*. at ¶¶26-27.  Mimun oversaw the Call Center sales floors where the solicitation of investors and trading activity took place.  *Id.* ¶¶24-25.  The Defendants made key business decisions and undertook or approved core activities of the enterprise including: deciding on the trading platform's features; hiring and paying the affiliate marketers; hiring, training, and paying the Call Center employees; setting the Call

Center sales' staff compensation structure (a structure that incentivized the fraud); contracting with credit card processors to receive customer deposits and pay the scheme's expenses; selecting business partners, and establishing business policies and procedures. *Id. at* ¶¶ 3, 18, 23, 25-26, 29-32, 39-51, 52-54, 55, 57-58, 59-66, and 67.

These facts establish that BenHarav and Mimun were each both a necessary participant and substantial factor in the offer and sale of the securities and that they devised the scheme by which the securities would be sold. They are both liable for violations of Section 5 of the Securities Act.

### ii. The SEC has Stated a Claim that Defendants Committed Securities Fraud – Counts One and Two

Counts One and Two of the Complaint assert that BenHarav and Mimun violated the anti-fraud provisions of the securities laws. In Count One, the SEC asserts a claim under Rule 10b-5(a) and (c), the implementing regulation for Section 10(b) of the Exchange Act. 15 U.S.C. § 78j; 17 C.F.R. § 240.10b-5. In Count Two, the SEC asserts a claim under Sections 17(a)(1) and (3) of the Securities Act. 15 U.S.C. § 77q. All four of these provisions "prohibit fraudulent conduct or practices in connection with the offer or sale of securities" by means of interstate commerce. *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 855–56 (9th Cir. 2001).

Fraudulent conduct includes conduct that creates a false appearance of fact, misrepresentations, and misleading omissions. *See Lorenzo v. SEC*, 139 S. Ct. 1094, 1101 (2019) (misrepresentations and omissions are a type of fraudulent practice) and *In re Enron Corp. Sec., Derivative & ERISA Litig.,* 235 F.Supp.2d 549, 580 (S.D.Tex.2002) (the creation of a false appearance is a fraudulent practice).

Where the fraud involves multiple entities or individuals, a defendant is liable if he personally engaged in fraudulent conduct or enlisted others to do so with the

requisite intent.  *Lorenzo* at 1101-04; *SEC v. Weaver*, 773 Fed. Appx. 354, 356 (9th Cir. 2019).

A defendant's negligence is sufficient for liability under Section 17(a)(3).  *Aaron v. SEC*, 446 U.S. 680, 687 & 691-702 (1980).  Liability under the three remaining provisions requires proof that the defendant intended to deceive, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976), or that the danger of misleading buyers or sellers was so obvious that the defendant must have been aware of it.  *Hollinger v. Titan Capital Group*, 914 F.2d 1564, 1569-70 (9th Cir. 1990) (citations omitted).  Evidence that a defendant contributed to the success of a scheme he knows to be fraudulent is evidence of an intent to deceive.  "The scheme itself may be probative circumstantial evidence of the intent to defraud."  *United States v. Jenkins*, 633 F.3d 788, 804 (9th Cir. 2011).

The entire "course of business" of JRMB and the Straw Companies was fraud – to deceive investors into believing that they could make money with the Brokers when, in reality, the offered investments were likely to lose money with the losses going to the Brokers and their owners, BenHarav and Mimun.  The fraud was committed through email, the internet, and the telephone, which are means of interstate commerce.  *Id*. at ¶¶12, 30, 34, 41-52.  BenHarav and Mimun both personally participated in the fraud with the requisite intent.  Defendants owned and controlled JRMB, which operated the Call Center, and owned and controlled the Straw Companies doing business as the Brokers.  ECF No. 1 at ¶¶17-19, 21-28.  As set forth above, the Defendants made key business decisions and undertook or approved core activities of the enterprise.  *Id. at* ¶¶ 3, 18, 23, 25-26, 29-32, 39-51, 52-54, 55, 57-58, 59-66, and 67.  BenHarav and Mimun knew that the purpose of the enterprise was to defraud and they intended to contribute to the success of the enterprise through their day-to-day supervision.  ECF No. 1 at ¶¶21-28.

In addition to the day-to-day running of the operation, each Defendant personally engaged in specific fraudulent conduct with the requisite intent.  Both BenHarav and

Mimun met with the platform provider on the design of the "Win Button," which acted as a bait-and-switch device. *Id.* at ¶53. BenHarav personally directed the creation of one marketing campaign containing misrepresentations about the profitability of the Brokers' binary options and hired marketers to disseminate his, and the affiliate marketer's own, false advertising. *Id.* at ¶¶29-31. Mimun trained the Call Center sales agents to use misrepresentations and deceptive tactics to obtain investor deposits and even listened in on their sales calls to coach them on better, more effective ways to obtain deposits. *Id.* at ¶¶9, 24-25, 42-44. BenHarav and Mimun's purpose in engaging in this conduct was to deceive because that is how the companies and their owners – the Defendants – made money.

### iii. The SEC has Stated a Claim that Defendants Controlled and Aided and Abetted JRMB's and the Straw Companies' Fraud – Counts Four, Six, and Seven

Because BenHarav's and Mimun's fraudulent intent is imputed to JRMB and the Straw Companies, the Complaint states a plausible claim for securities fraud against these entities in violation of the Securities Act and the Exchange Act. *See In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015) (the knowledge and intent of a corporation's officers are imputed to the corporation).

Count Four of the Complaint asserts claims against BenHarav and Mimun under Section 20(a) of the Exchange Act, which imposes liability on control persons for Exchange Act violations committed by those they control.[1] *See* 15 U.S.C. § 78t. Corporate officers with responsibility for a corporate violator's day-to-day operations have the power to control or influence the corporation and are liable for the corporation's Exchange Act violations. *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1442 (9th Cir. 1987), *abrogated on other grounds by Hollinger v. Titan Capital*

---

[1] The controlling person provision of the Securities Act covers violations that are not at issue in this case.

*Corp.,* 914 F.2d 1564, 1575 (9th Cir.1990).

The Complaint also alleges that BenHarav and Mimun aided and abetted JRMB and the Straw Companies' violations of the Exchange Act (Count Six) and the Securities Act (Count Seven). The elements of both Counts are the same: (1) the existence of a securities law violation by JRMB and the Straw Companies; (2) BenHarav's and Mimun's actual knowledge or reckless disregard of the wrongs and of his or her role in furthering it; and (3) substantial assistance by BenHarav and Mimun in the achievement of the unlawful conduct. *See Ponce v. SEC*, 345 F.3d 722, 737 (9th Cir. 2003) (setting forth the elements); *SEC v. Fehn*, 97 F.3d 1276, 1288 (9th Cir. 1996) (elements are the same under both Acts).

Because BenHarav and Mimun each exercised day-to-day control over JRMB and the Straw Companies, they are liable as controlling persons for the entities' Exchange Act violations. And because BenHarav and Mimun knowingly, or at a minimum recklessly, provided substantial assistance to JRMB and the Straw Companies in defrauding investors, they are liable for aiding and abetting the fraud.[2]

### iv.  The SEC has Stated a Claim that Defendants Controlled an Unregistered Broker – Count Five

In Count Five, the SEC alleges that BenHarav and Mimun are liable as control persons for JRMB and the Straw Company's failure to register with the SEC as a broker or dealer.

---

[2] Some courts in this Circuit have held that it would be impermissible double counting to hold a corporate officer primarily liable for securities fraud and secondarily liable for the corporation's securities fraud where the corporation's liability is based exclusively on the officer's conduct and intent. That is not an issue here where JRMB's and the Straw Companies' liability is based on the conduct and intent of both BenHarav and Mimun. *See SEC v. City of Victorville*, No. EDCV1300776JAKDTBX, 2017 WL 11679413, at *49 (C.D. Cal. June 2, 2017) (rule against double counting corporate officer's conduct and intent as both primary and secondary violations did not apply where corporate liability was based on the conduct and intent of at least two natural persons).

Section 15(a)(1) of the Exchange Act provides that, absent an applicable exception or exemption, any broker or dealer that uses an instrumentality of interstate commerce "to effect transactions in, or to induce or attempt to induce purchases or sales of securities…must register with the Commission[.]" 15 U.S.C. § 78o(a). Section 3(a)(4) of the Exchange Act defines a "broker" as "any person engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4).

Several nonexclusive factors are relevant in determining whether an entity acted as a broker, including whether the entity:

(1)  compensates its securities sales force through commissions as opposed to salary;

(2)  sells, or previously sold, the securities of other issuers;

(3)  is involved in negotiations between the issuer and the investor;

(4)  gives advice on the merits of the investment;

(5)  is an active rather than passive finder of investors;

(6)  possesses customer funds and securities;

(7)  holds itself out as a broker;

(8)  directs the majority of its operations towards effecting securities transactions.

*SEC v. Benger*, 697 F. Supp. 2d 932, 944-45 (N.D. Ill. 2010) (factors are nonexclusive); *SEC v. Martino*, 255 F. Supp. 2d 268, 283 (S.D.N.Y. 2003) (first six factors); *Strengthening the Commission's Requirements Regarding Auditor Independence*, Exch. Act Rel. No. 47265, 68 FR 6006, 6015 n.82 (Feb. 5, 2003) (adopting release) (holding out as a broker); *SEC v. Interlink Data Network of L.A., Inc.*, Civ. A. No. 93-3703 R, 1993 WL 603274 at *11 (C.D.Cal. Nov. 15, 1993), 1993 U.S. Dist. LEXIS 20163 (C.D.Cal. Nov. 15, 1993) ("virtually the entire operations" of the defendants consisted of 'effecting transactions in securities for the accounts of others.'").

JMRB, through the Call Center, and the Straw Companies, doing business as the Brokers, acted as brokers. The Call Center securities sales force was paid a percentage

of monies that were deposited by investors to whom they spoke. *Id.* at ¶¶39-71. The Call Center employees and the Brokers, through their marketing, websites, and trading engine, all purported to advise investors on the merits of trading security-based binary options. *Id.* at ¶¶39-71; *Id.* at ¶¶29-31; *id.* at ¶¶33-38. The Brokers actively sought out investors through affiliate marketing, *id.* at ¶29-32, and, once an investor opened an account, the Call Center actively sought to induce investors to deposit funds and trade. *Id.* at ¶¶39-43. The Straw Companies owned the accounts into which investor funds were deposited and JRMB had access to those accounts. *Id.* at ¶¶17, 36, 75. The Call Center employees and the Brokers held themselves out as brokers. ECF No. 1 at ¶42. The majority, if not all, of these entities' operations were directed at effecting securities transactions.

The foregoing facts are sufficient to allege a plausible claim that JMRB and the Straw Companies acted as unregistered brokers in violation of Section 15(a). Because BenHarav and Mimun directed the day-to-day operations of the entities, BenHarav and Mimun are liable as controlling persons for the entities' violations.

### C. The Amount of Money at Stake

The fourth *Eitel* factor requires the court to consider "whether the recovery sought is proportional to the harm caused by defendant's conduct." *Hand & Nail Harmony, Inc.,* 2015 WL 4378197 at *3 (citation omitted). The SEC seeks $25,777,909.10 in disgorgement from Defendants, which is equal to the U.S. investor funds that Defendants obtained through fraud and appropriate for the reasons set forth in section IV below. The SEC also seeks a statutory penalty pursuant to the formula and factors Congress has established as appropriate. *See* 15 U.S.C. §78u(d)(3). *See also SEC v. VerdeGroup Inv. Partners, Inc.*, No. 2:21-CV-07663-SB-ADS, 2022 WL 2200409, at *6 (C.D. Cal. Jan. 14, 2022) (penalty assessed for securities fraud according to statute was proportional to harm caused by defendants).

### D. There is no Possibility of a Factual Dispute

The fifth *Eitel* factor considers the possibility of dispute as to any material facts in the case. *Hand & Nail Harmony, Inc.,* 2015 WL 4378197 at *4. *See also TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987). Where, as here, the Complaint is sufficient to state a claim, and must be deemed true by virtue of default, there is no possibility of such a dispute. *Hand & Nail Harmony, Inc.,* 2015 WL 4378197 at *4.

### E. Defendants' Failure to Defend Was a Calculated, Culpable Decision, Not the Result of Excusable Neglect

The sixth *Eitel* factor considers the possibility that the default resulted from excusable neglect. *Hand & Nail Harmony,* 2015 WL 4378197 at *4. A defendant's conduct is culpable, rather than excusable, if the defendant received actual or constructive notice of the filing of the action and failed to answer. *Id.* (citation omitted). Here, Defendants have actual notice of the Complaint because they were formally served with it via the Hague Convention several months ago. ECF Nos. 6, 14, and 15.

Defendants also have actual and constructive notice of the Complaint, as it was widely reported in Israel and on the Internet. For example, on or about July 2021, the Times of Israel contacted BenHarav and Mimun through their attorney, Ayelet Baram, seeking comment on the SEC's Complaint in this matter. *See* Simona Weinglass, "2 North American "Idealistic Immigrants" Charged with Close to $50 Million Fraud," The Times of Israel (July 29, 2021), attached as Exhibit 1. On July 29, 2021 the Times of Israel published an article summarizing the SEC's Complaint and reporting on another case filed by a defrauded investor against Defendants in connection with their sale of security-based binary options. *Id.* These facts amply demonstrate that Defendants' decision not to defend this case was deliberate, not inadvertent.

17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### F.  The Policy of Deciding Case on the Merits is not Frustrated where Defendant Deliberately Chooses not to Defend

The seventh *Eitel* factor considers the public policy that "[c]ases should be decided upon their merits whenever reasonably possible." *Eitel,* 782 F.2d at 1472. While this policy generally favors a decision on the merits, a default judgment is appropriate where a defendant deliberately neglects to wage a defense, as is the case here. *Hand & Nail Harmony, Inc.,* 2015 WL 4378197 at *4. ("Defendant's failure to answer Plaintiff's Complaint makes a decision on the merits impractical, if not impossible.") (citations omitted).  Here, Defendants have, with full knowledge of these proceedings, abandoned any defense to the SEC's claims and, under those circumstances, a default judgment does not frustrate the public policy favoring the resolution of disputes on the merits.

## IV.   RELIEF REQUESTED

### A. The Court should Order Defendants to Disgorge Ill-Gotten Gains, together with Prejudgment Interest

The Court is authorized to order disgorgement "that does not exceed a wrongdoer's net profits and is awarded for victims." *Liu v. SEC,* 140 S. Ct. 1936, 1940 (2020).   Disgorgement normally includes prejudgment interest to insure that wrongdoers do not profit from their illegal conduct and may be calculated using the rate provided by 26 U.S.C. § 6621 for tax underpayments.  *SEC v. Moore*, No. 215cv1865LDGGWF, 2017 WL 1404318, at *10 (D. Nev. Apr. 18, 2017).  Here, the SEC intends to return any disgorged funds collected to investors.  Therefore, the only question is the amount of Defendants' net profits and prejudgment interest.

The burden lies first with the SEC to show a "reasonable approximation" of the Defendants' net profits.  *SEC v. Platforms Wireless International Corp.,* 617 F.3d 1072, 1096 (9th Cir. 2010).  Once the SEC provides evidence of a reasonable approximation, the burden then shifts to the Defendants to "demonstrate that the

disgorgement figure was not a reasonable approximation." *Id.*  Because they have chosen not to respond to the Complaint, the Defendants cannot meet their burden here.

### i.  Defendants Net Profits are Equal to Deposits from U.S. Investors

The SEC has attempted to quantify Defendants' net profits in accordance with the Court's ruling in *Liu*.  In *Liu*, the Court held that net profits are the defendants' gross revenues less expenses that have "value independent of fueling a fraudulent scheme."  *Liu*, 140 S. Ct. at 1950.  Expenses can have independent value where a defendant commits fraud in the course of conducting a non-fraudulent business.  For example, a court permitted an investment advisor that fraudulently marketed a specific investment but also provided non-fraudulent advisory services, to deduct from gross revenues the general costs associated with setting up client accounts, billing clients, researching trading strategies, and executing trading instructions.  In contrast, expenses associated with the fraudulent portion of the business were not deductible including salaries and bonuses owed to employees who fraudulently marketed the investment, legal fees incurred in the sale of the fraudulent portion of the defendant's business, and legal fees incurred in responding to the SEC's subpoenas regarding the fraud.  *SEC v. Navellier & Assocs., Inc.*, No. 17-CV-11633-DJC, 2021 WL 5072975, at *5-7 (D. Mass. Sept. 21, 2021).

Where, however, "the entire profit of a business or undertaking results from the wrongdoing, a defendant may be denied inequitable deductions."  *Liu,* 140 S. Ct. at 1950.  For example, in *SEC v. Hallam*, the defendant worked for companies that owned oil and gas wells.  No. 21-10222, 2022 WL 2817119, at *21–22 (5th Cir. July 19, 2022).  Defendant's only job was to solicit investors through fraudulent statements.  Under these circumstances, defendant's entire salary constituted ill-gotten gains.  "[E]ven if the companies were partially legitimate, that doesn't change the fact that all of the securities transactions during the relevant period were unlawful [so that defendant's] unjust enrichment was 'the compensation [he] received for his role in the sale of these

19

securities.'"  *Id.* at *21-22.  Where all of a defendant's gains are obtained through fraud, allowing a defendant to deduct expenses paid out of such fraudulently obtained funds would impermissibly permit defendant to benefit from the fraud.  *SEC v. Penn*, 2021 WL 1226978, at *11 (S.D.N.Y. Mar. 31, 2021), *aff'd sub nom* (2d Cir. 2022).  "[A]ny portion of the misappropriated funds that were subsequently spent on allegedly legitimate expenses are "merely wrongful gains under another name."  *Id.* (citing *Liu*).

Here, all of Defendants' revenues (measured by the deposits taken in by the Brokers) were obtained through fraud; Defendant cannot get credit for expenses paid from fraudulently obtained funds.  Put another way, these expenses simply allowed the fraud to continue – they are not otherwise legitimate expenses that should be deducted from Defendants' disgorgement under *Liu*.

### ii.  Defendants should be Ordered to Disgorge $25,777,909.10 Plus $7,324,621.53 in Prejudgment Interest

Defendants should be required to disgorge the total amount investors in the United States deposited with the Brokers.  Conservatively, that amount is $25,777,909.10, plus $7,324,621.53 in prejudgment interest through April 15, 2023.

The Brokers offered every investor who created an account binary options based on securities.  *See, e.g.,* ECF No. 1 at ¶12, 34, 72-74.  Because the Brokers used fraudulent and unregistered securities offers to induce investors to make a deposit, all of the deposits are attributable to the unlawful conduct and constitute ill-gotten gains.[3]

Investor deposits were the sole source of revenue for the Brokers.  Declaration of Jason Anthony at ¶3, attached as Exhibit 2.  The Relevant Period during which Defendants' violations occurred is lasted 31 months.  ECF No. 1 at ¶1.  The SEC was only able to obtain partial financial records for the Brokers' and only for a nine-month span within the Relevant Period.  Ex. 2 at ¶¶9-14, 17.  During that nine-month period,

---

[3] The Defendants' violations are not limited to the offers made to investors who opened an account; the Defendants violated the securities laws with every offer they made.

the Brokers received approximately $25,777,909.10 in US-based credit card payments and wire transfers that were not subsequently refunded. *Id.* at ¶4. This total amount is almost certainly less than the total amount of ill-gotten gains attributable to U.S. investors because it covers less than one-third of the time period during which the violations occurred and is based on incomplete records.

It is not necessary for the Court to determine which portion of these funds ultimately wound up in the pockets of BenHarav or Mimun. While, ordinarily courts may not impose disgorgement on a defendant for profits that "accrued to another," courts may impose joint and several liability where several persons engage in "concerted wrongdoing." *Liu,* 140 S. Ct. at 1949. Where individual defendants "played an integral role" in a fraudulent offering, joint and several liability is appropriate. *SEC v. Liu*, No. 21-56090, 2022 WL 3645063, at *3 (9th Cir. Aug. 24, 2022) (on remand from the Supreme Court) (upholding joint and several liability disgorgement judgment against corporate officers for ill-gotten gains obtained from a fraudulent offering). Here both BenHarav and Mimun played an integral role in the fraudulent scheme that allowed the Brokers to obtain millions in investor funds. The SEC therefore seeks a judgment for $25,777,909.10 in disgorgement against Defendants, jointly and severally, together with pre-judgment interest through April 15, 2023, at the rate provided by 26 U.S.C. § 6621 for tax underpayments, of $7,324,621.53. *Id.* at ¶5.

**B. The Court Should Impose Civil Monetary Penalties on both Defendants.**

The SEC also requests maximum "third tier" civil penalties against Defendants. Third tier penalties are available when the securities law violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement [and] such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial loss to other persons." 15 U.S.C. §§ 77t(d)(2)(C) (Securities Act); §78u(d)(3)(B)(iii) (Exchange Act).

The Defendant's violations resulted in more than $25 million in investor losses easily satisfying the standard that the losses are "substantial." Indeed, for the reasons discussed above, this figure is an undercount of investor losses.

In determining the appropriate penalty, the Court should also consider (1) the degree of scienter involved; (2) the isolated or recurrent nature of the infraction; (3) the defendant's recognition of the wrongful nature of his conduct; (4) the likelihood, because of the defendant's professional occupation, that future violations might occur; and (5) the sincerity of his assurances against future violations. *CMKM Diamonds, Inc.*, 729 F.3d at 1192. All five factors weigh in favor of a significant penalty.

(1)   Defendants acted with a high degree of scienter. In particular, Defendants orchestrated and administered the scheme, which was premised on maximizing investor losses while convincing investors that the opposite was true – that trading with the Brokers was profitable and that JMRB sales agents were there to help.

(2)   The violations were recurrent, lasting from at least December 2014 through June 2017, a period of 31 months. ECF No. 1 at ¶1.

(3)   Neither Defendant has recognized the wrongful nature of his conduct. According to news reports about a lawsuit filed by an investor in Israel, Defendants "consistently denied that they had anything to do with Porter Finance, most recently in their June 2021 cross-examination in the case, during which both men reportedly mispronounced and misspoke the name "Porter Finance," claiming to know nothing of this website and insisting that the woman's lawsuit against them was an unfortunate case of mistaken identity." *See* Ex. 1.

(4)   Defendants have not even accepted responsibility for their actions, let alone making any promises not to defraud in future.

The maximum third tier penalty is the greater of:

(1)   $223,229 per violation for a natural person or $1,116,140 per violation for

a business entity, *see* 17 C.F.R. § 201.1001 and SEC Release Nos. 33-11143; 34-96605; IA-6212; IC-34797 (2023 Adjustments); or

(2)   the "gross amount of pecuniary gain" to the defendant as a result of the securities law violation.   15 U.S.C. §§ 77t(d)(2)(C) (Securities Act); §78u(d)(3)(B)(iii) (Exchange Act).

The decision to impose a penalty and in what amount is subject to the Court's discretion.   *SEC v. Aura Financial Services, Inc.*, No. 09-21592-Civ., 2010 WL 3419200, at *3 (S.D. Fla. July 14, 2010).

Courts choosing to calculate a penalty based on a per violation approach have determined the number of violations in a variety of ways including the number of investors harmed, the number of unlawful transactions, or viewing a continuing scheme as a single violation.   *See, e.g., SEC v. Wu*, No. 11-cv-04988-JSW, 2017 WL 11518453, at *6 (N.D. Cal. Sept. 20, 2017) (citing examples).

Under the first approach, each binary options offer was a violation because each offer was fraudulent and involved an unregistered security.   Conservatively treating each month that Defendants operated the scheme as a single violation results in a per violation penalty for each Defendant of $6,920,099 (31 months x $223,229).   Under the second approach, the gross amount of each Defendants' pecuniary gain is $12,888,954 ($25,777,909 in ill-gotten gains divided by 2).   Given that this was a long running fraud, the SEC asks that each Defendant be penalized in the amount of $12,888,954 to deter others from engaging in this type of conduct.

## C. The Court Should Enjoin Defendants from Future Violations of the Securities Laws

Both the Securities Act and the Exchange Act provide that upon a "proper showing" the Commission may obtain a permanent injunction against any person who is engaged in a violation of any of the provisions of the securities acts or regulations. 15 U.S.C. § 77t(b) and 78u(d)(1).

The Commission is entitled to an injunction if it can show a reasonable

23

likelihood that the defendant will violate the securities laws in the future. *Murphy,* 626 F.2d at 655.  The existence of past violations may give rise to an inference that there will be future violations.  *Id.*  Additional factors relevant to determine the likelihood of future violations are the same factors to be considered in assessing penalty.  *Id.*  The same facts that justify imposition of a third-tier penalty against Defendants also justify injunctive relief against them.

## V. CONCLUSION

For the foregoing reasons, the SEC respectfully requests that the Court enter a default judgment against Defendants, enjoin them from future violations of the anti-fraud and registration provisions of the securities laws, order Defendants to pay disgorgement, jointly and severally, in the amount of $25,777,909.10, together with pre-judgment interest of $7,324,621.53, and order each Defendant to pay a civil monetary penalty in the amount of $12,888,954.50.  A proposed form of final judgment is submitted as Exhibit 3 for the Court's consideration.

Dated:  April 20, 2023                                  Respectfully submitted,

                                                                       */s/ Samantha M. Williams*
                                                                       SAMANTHA M. WILLIAMS
                                                                       Attorney for Plaintiff
                                                                       Securities and Exchange Commission